citation of authorities to sustain it.  The first resolution provides that Cayuga street shall be continued south to the city line.  It cannot be so continued unless it crosses the tracks of the defendant.  The last resolution provides that the city attorney be directed to cause due notice of the laying out of such street "across" the tracks occupied by the Delaware, Lackawanna & Western Railroad Company, etc.; so that the intention is obvious.  And the language used is sufficient to make the intention clear, and lays out said street, not only to the defendant's tracks, but across them.  The street has been duly and lawfully laid out.  The defendants have been notified, as the law requires.  The street has been constructed up to the line of their tracks.  It is their duty to take it across them, "as shall be most convenient and useful for public travel."  The manner of doing it, and at what grade, is a detail with which we have nothing to do at present, and that the plaintiff cannot dictate or determine.

The judgment is affirmed, with costs.  All concur.

(11 App. Div. 28.)

## DAVIDSON v. MEXICAN NAT. R. CO.

(Supreme Court, Appellate Division, Second Department.  December 15, 1896.)

1. CORPORATIONS—VALIDITY OF ISSUE OF STOCK—ESTOPPEL.
    A corporation cannot deny the validity of an issue of stock by another corporation, where it has succeeded such corporation, and obtained valuable property, under an agreement which recognizes the stock as one of the liabilities of the old corporation.

2. APPEALS—DEFENSES NOT PLEADED.
    Defenses not pleaded will not be considered on appeal.

3. CORPORATIONS—REORGANIZATION—SETTLEMENT OF CLAIMS.
    A contract for the reorganization of a railroad company, which provides for a division of its property between its successor and a construction company, each to take its share free from all liens of the other, does not extinguish a claim of the construction company against a sum of money set aside to pay the debts of the old railroad company, when the officers of the new railroad company have not so construed it.

4. SAME—STATEMENT OF DEBTS—PRESUMPTION OF FRAUD.
    The treasurer of the C. Co., who was also treasurer of the R. Co., in making a statement of the floating debt of the R. Co., for persons who were reorganizing it, included a large debt due to the C. Co., in a lump sum, alleged to be due to "individuals and companies."  The reorganizers did not ask the names of the creditors, but appropriated enough to pay the debt.  Held, that they could not have been misled to their prejudice by the treasurer's statement, and, as the debt claimed was an honest one, fraud would not be presumed.

5. SAME—OUTSTANDING DEBTS.
    The C. Co. lent the R. Co. 8,000 shares of the R. Co.'s stock for use as collateral, and the R. Co. agreed to return the stock, or pay $10 a share therefor, which was double its value.  Forty thousand dollars was borrowed, and the lender was given an option to take the stock and discharge the debt.  This he did.  The R. Co. was reorganized, and a fund appropriated for the payment of its outstanding indebtedness.  Out of this fund the C. Co. claimed $10 a share for the stock.  Held, that the $40,000 used could be recovered, but the penalty for failure to return the stock was not an outstanding indebtedness to which the fund could be applied.

6. PLEDGES—WHEN SALE OF PLEDGE NOT PRESUMED.
    A sale of part of pledged materials to the pledgee will not be inferred from the facts that in making a separate account of the pledged materials, which

·had been· originally credited to the pledgor, the pledgee did not transfer a
certain item to such account, but left it to the credit of the pledgor, that the
charge was undisputed for nine years, and that the property which the item
represented was in the possession of the pledgee when last heard of, when
there is testimony that the item should have formed a part of the pledged
material account, that there was nothing to show an actual sale, and that
the property always belonged to the pledgor.

7. INTEREST—WHEN SUSPENDED.
     A corporation occupies the position of a trustee with regard to a fund which
it sets aside to pay the debts of the corporation which it has succeeded, and
is entitled to a reasonable time for settlement of such debts, during which
interest should be suspended; but if it is not diligent, or unreasonably re-
sists payment of a just claim, it is chargeable with interest from the time
when such claim should have been paid.

Appeal from trial term, Kings county.

Action by Joseph A. Davidson against the Mexican National Rail-
road Company. From a judgment in favor of plaintiff for a less
amount than that claimed, both parties appeal.     Modified.

The Mexican National Railway Company having become involved in financial
difficulties, and being unable to meet its obligations, an agreement, known as the
"Matheson-Palmer Agreement," was entered into, by which the bondholders put
in more money, and a new corporation was formed, to be known as the Mexi-
can National Railroad Company, and to take the place of the old organization.
Article 4 of this agreement provided that a certain portion of the railroads and
other belongings of the Mexican National Railway Company should become the
property of the proposed railroad company, free from all liens or claims of
the Mexican National Construction Company, which was a large creditor of the
old railway company.     The remaining railroads and property of the railway
company were to become the property of the construction company, free from
all liens created by the old company, or claims of the new company.     Article
5 provided that $217,000 should be set aside to meet the outstanding obligations
of the existing railway company.     While the negotiations which resulted in
the Matheson-Palmer agreement were pending, William M. Spackman, who was
treasurer of both the construction and the railway companies, was called upon
by the parties to the agreement for a statement of the outstanding indebtedness
of the railway company.     In making this statement, he included, in a lump
sum, itemized as individuals and companies, a large debt due to the construc-
tion company.     His good faith in this proceeding was questioned· on the trial.
Some two years previous to the making of the Matheson-Palmer agreement,
the construction company, fearing an attachment at the hands of its creditors,
entered into the "Pledged-Material Agreement," by which it pledged to the rail-
way company all of its property.     The amount at which such property was
valued was credited to the construction company on the railway company's books,
but, shortly after, the railway company opened a new account, called the
"Pledged-Material Account," and all of the items relating to such material were
transferred to that account, except one of $23,962.09, which was left to the
credit of the construction company.     This item represented property of the con-
struction company which had been taken and used by the railway company.     The
construction company claimed that such transfer amounted to a sale, and that
it was entitled to recover the $23,962.09.     The railway company, opposing, claim-
ed that the sum to the credit of the construction company remained there by
mistake, as such item should have been transferred to the pledged-material ac-
count.     Shortly before the commencement of this action the Mexican National
Construction Company assigned its claims against the railroad company to the
plaintiff herein.

Argued before BROWN, P. J., and BARTLETT, HATCH, and
BRADLEY, JJ.

Treadwell Cleveland, for defendant.
Edward M. Shepard, for plaintiff.

HATCH, J.    From April, 1884, to October, 1884, the Mexican National Railway Company and the Mexican National Construction Company trembled on the verge of bankruptcy.    In the latter month, after constant and continuous effort, the two companies succeeded in effecting an agreement between themselves and certain holders of the bonds and stock of the railway company, for a scheme of reorganization whereby the railway company was to be absorbed in a new corporation to be thereafter formed, fresh money was to be injected into the languishing enterprise, payment of its bonds provided for, the plan of its organization preserved, and the purpose of its creation fostered and progressed.    This instrument is known to this action as the "Matheson-Palmer Agreement."    It does not appear that there has ever been any disagreement or difficulty respecting the fulfillment to the letter of every stipulation contained in this agreement by the respective parties thereto, so far as the same relates to the reorganization scheme.    Under it the new corporation was organized, the properties therein mentioned have been delivered to and accepted by the respective parties and companies, the securities provided for have been executed and delivered to those entitled thereto, the bondholders have ratified the scheme and accepted the substituted securities, the new bonds have been sold, and the fresh money has been realized for the purposes contemplated.    The particular fund which is the subject of this controversy is now awaiting distribution to the present claimant, or, in the event of failure in this regard, it will go to swell the reserve fund for the payment of the obligations of the defendant.    When the present claim was first asserted the parties negotiated for a settlement of it for nearly three years, and, failing to agree, resort was had to a friendly and a hoped-for speedy settlement, through the medium of an arbitration.    No one, however far seeing, could have contemplated the tortious course which the litigation was to take, or the fierce battle which was to ensue. During the contest forensic debate has shone forth clothed in brilliant attire, ingenuity of statement has surpassed itself, and sustained effort by both parties is presently a marvel for the court. After proceeding with the arbitration from the 14th day of April, 1890, to the 16th day of July, 1891, and when there seemed some prospect of an end being reached, defendant served notice of revocation.    Thereupon, on the 12th day of September, 1891, this action was commenced.    On the 28th of October, 1891, the supreme court upon petition of the defendant, entered an order directing that the action be removed into the circuit court of the United States.    The cause was pending and tried in the United States circuit court during the years intervening between its removal, and early in 1895. 58 Fed. 653.    This trial was had before Judge Wheeler, of the circuit court, and resulted in a judgment for the plaintiff in the sum of $151,832.41.    On writ of error being taken by defendant from this judgment to the federal circuit court of appeals, a question of jurisdiction of the federal courts over the action was raised by defendant, and certified by the appellate court to the supreme court of the United States (13 C. C. A. 692), where the question was resolved in

favor of the defendant, and the federal courts ousted of jurisdiction. Railroad Co. v. Davidson, 157 U. S. 201, 15 Sup. Ct. 563. This result brought the action again into the supreme court of this state, and it found its way to a trial before Mr. Justice Cullen in May and June, 1895, resulting in a judgment in plaintiff's favor for the sum of $95,237.92. An appeal by defendant from the judgment, and by plaintiff from certain parts of the judgment particularly specified, brings the matter before this court. It is quite within the province of the court to determine when a matter has been sufficiently litigated, and there is no attribute of immortality attaching to any litigation, even though some controversies seem to cast the question in doubt. In the orderly administration of justice by the courts, there must come a time when a given litigation must be composed, and when, if necessary to that end, technical and somewhat arbitrary rules must be enforced, or disregarded, as the case may be. Greenwood v. Marvin, 111 N. Y. 440, 19 N. E. 228. This litigation is closely allied to the class where justice demands an application of this rule, and a proper regard for all parties requires an earnest attempt to settle finally the questions at issue. It is not at all surprising, in this maze of accounts, creating a very labyrinth, that confusion should arise. The most patient labor finds itself bewildered amidst the various contracts and accounts, each one a complication by itself, and the whole a staggering mass of amount, and intricacy making the attempt to reach a correct result nearly as elusive as is the pursuit after perpetual motion. Such a condition makes it possible for counsel to march in steady column, with page upon page of brief, to the demonstration of a particular theory extracted from the mass. This condition furnishes abundant reason why, in the disposition of the questions presented, we should rigidly hold the parties to the issues which the pleadings present, and reject consideration of questions not technically embraced therein.

So far as we purpose to discuss the questions presented, it appears that plaintiff seeks to recover, as assignee of the construction company, a debt due by the railway company to the construction company, in the sum of $111,454.28. This sum is made up of two items, —$104,244.10 for work, labor, and materials, and $7,210.18 for interest upon the principal sum to September 30, 1886. It appeared without dispute that upon the books of both companies the entries showed this amount of indebtedness, and plaintiff becomes entitled to recover this sum, unless it be defeated or reduced by the defense which has been offered. Plaintiff also claims to recover an additional sum of $80,000. Defendant insists that in fact no indebtedness existed in favor of the construction company against the railway company on the date of the Matheson-Palmer agreement. On the contrary, it is claimed that the indebtedness was upon the other side: First. In that there had been an overissue of stock and bonds by the railway company to the construction company in payment for construction; that this excess of stock was illegally issued, and constituted no obligation against the railway company; that, as it was in fact paid for in securities provided by the Matheson-Palmer agree-

ment, no debt now exists which the construction company is equitably entitled to enforce.    Second. That the Matheson-Palmer agreement worked a general release of the claims of each company, as against the other. . Third. That an indebtedness actually exists in favor of the railway company against the construction company for $207,000, which is an offset to the claims of plaintiff.    Fourth. That the fund of $217,000 inserted in the Matheson-Palmer agreement was procured to be so inserted by the fraud and misrepresentation of the officers of the construction company, and therefore does not embrace its claim.    The discussion will proceed in this order.

It is quite true, as claimed, that the railway company was, for all practical purposes, the creation of the construction company, and that the latter at all times elected a majority of its board of directors, and practically controlled its corporate action.    It does not appear, however, so far as the accounts kept by the respective companies are concerned, that the construction company took any unfair advantage of the railway company in the entries which were made, and at no time was there any attempt to deal unfairly by the construction company with the railway company in the books kept by the respective companies, although the construction company dictated very largely the transactions from which the accounts were made up, and the books now show, in the main, what the actual transactions were. While it is to be conceded that the construction company was in the practical control of the enterprise, yet such condition was perfectly well known to all the parties who entered into the Matheson–Palmer agreement.    The parties thereto were engaged in negotiations for a long time prior to its actual execution, in the city of New York, at which time there were open for inspection by all parties interested the books, accounts, and contracts between the two companies; and we must presume that the persons and counsel representing the bondholders informed themselves as to the details contained in the books and papers, to which they had access.    In addition to this, it appears that the negotiations in New York were somewhat summarily suspended by the representatives of the bondholders, when they went upon a secret mission to Mexico, presumably to inform themselves of the condition of the property by actual inspection, and after such examination the negotiations thus interrupted were renewed in Mexico, and the agreement reached in that republic, in the presence of the property.    The overissue of bonds and stock to the construction company for the construction and equipment of the railway must have been as well known then as now.    It was taken into consideration, and furnished in part the basis upon which the agreement was reached.    The issue of stock was all provided for, and recognized as a subsisting and legal obligation against the railway company.    The number of miles of railway constructed, the character of construction, the number of miles of railroad yet to be constructed, and the practical character of the country over which it was to pass, must have been known at the time, and fully appreciated by all the parties to the agreement.    Bearing these facts in mind, we can readily see that as between the parties to this agreement and

the defendant, who accepted of its benefits, no question can be raised respecting the agreement made on the 1st day of May, 1884, through which the overissue of stock was provided. If that agreement was in fact illegal, and the issue of stock therein provided for was in excess of the amount which the construction company had the right to demand and receive of the railway company, yet the bondholders of the latter company, who alone could complain, have never made objection thereto, and are not now asking that the transaction be set aside. So far as the defendant is concerned, it is estopped from questioning the legality of that issue of stock, or, for that matter, of any other. It has accepted the railway property under the Matheson-Palmer agreement, has obtained property of immense value thereby, and consented and agreed that this stock should be provided for, and has, in fact, made such provision. It is insisted, however, that this condition does not affect the present question; that the rights of plaintiff in and to this trust fund are to be determined precisely as though the question arose between the construction company and the railway company, in an attempt by the former to enforce its obligations against the latter. The fund which is provided for the payment of the floating obligations of the railway company is the product of the Matheson-Palmer agreement, and is, so far as defendant is concerned, subject to precisely the same rules as apply to any other portion or part thereof. It is certainly anomalous to say that this stock held by the construction company shall be treated as a valid and subsisting obligation for the purpose of being provided for by the bonds of the defendant, and shall be held invalid for the purpose of establishing a debt against the railway company of which payment is to be made by the provisions of the same agreement in another transaction. But, assuming the position to be sound, we are unable to afford defendant comfort by the assumption. No such issue is raised or presented by the pleadings. The answer contains no allegation of fraud upon the part of the construction company in procuring the overissue of stock. It is argued that the agreement of May, 1884, was illegal, and in violation of prior existing contracts, and was not founded upon a valuable consideration; that, in fact, it was a fraud upon the bondholders, and created no liability against the railway company. No bondholder is here complaining, and the answer of the defendant will be searched in vain to find any allegation that the agreement of May, 1884, was illegal, or that, in fact, any issue of stock was illegal, under this agreement or any other. On the contrary, the express allegation of the answer is that the railway company issued nearly all of its stock to the construction company, and there is not a suggestion of allegation that such issue was illegal. In addition to this, the answer alleges, in connection with the claim for $80,000 by the construction company, to be hereafter disposed of, that the stock there loaned was the property of the construction company. The claim, therefore, that the construction company was without title to the stock of the railway company which it held, and cannot now enforce it, or have it considered in establishing a claim against the railway company, cannot be upheld; and, for

all the purposes of this controversy, the stock held by the construction company at any time must be regarded as valid obligations of the railway company, and enforceable as such. This conclusion renders unnecessary of consideration whether, in fact, the true construction of the contracts between the companies authorized the issue of stock upon an average of all lines agreed to be constructed, based upon the cost of construction. It was not disputed but that the road actually constructed was the most expensive part, costing, as the evidence tended to establish, double the estimated cost of the portion unconstructed. And it might well be that there was no over-issue of stock based upon this construction of the contract. But, as before observed, we do not consider it. Under our present ruling, it is also immaterial whether the length of constructed lines was 650.78 miles, as claimed by defendant, or 947½ miles, as claimed by plaintiff. No issue is presented upon this question.

2. It is not contended that the Matheson-Palmer agreement contains any specific or general words of release of all claims due by the railway company to the construction company. The parties therein made particular specification respecting the written obligations which the construction company held, and dealt with all the property owned by the two companies, making particular disposition as to each. In the clause which sets apart the sum of $217,000 to be applied in liquidation of the indebtedness of the railway company, no words of exclusion are used, but in its terms is embraced any person or company who were creditors of the railway company, to the extent of the sum set apart. If the claim now asserted by the construction company was released, such release must be found in the character of the dealing between the parties, the relation they bore to each other, and the character of the instrument executed, as it cannot be so found from any language used therein. The sum set apart did not constitute it the property of the defendant, in the sense in which that term was understood and dealt with in article 4 of the agreement. That related to the property conveyed to defendant, not to money set apart by it for the payment of debts; and, as to that property, it could not be claimed that the construction company retained any interest, or could obtain any, except in the particular manner therein specified. At the most, this claim must rest in inference arising upon all the proof, and we are unable to find, as was the court below, that such intention existed, or that it was accomplished by the agreement, or by anything which transpired. On the contrary, defendant's president and board of directors placed no such construction upon the agreement or the acts of the parties, as is evidenced by the communication of the one and the action of the other early in 1888. This defense must be rejected.

3. So far as this claim is based upon the alleged failure of the construction company to comply with its contract to furnish the equipment to the railway company for the stock and bonds issued to it, in consequence of which the lease contract of equipment is claimed to be invalid, it cannot be upheld. The lease contract of equipment stands upon practically the same footing as the claim made respect-

ing the overissue of stock and bonds for construction. In pursuance of the latter contract the railway company agreed to pay the con- struction company for rolling stock, etc., $1,720,000, in 10 years from the date of the contract. The construction company subsequently assigned this contract to the Guaranty Trust & Safe-Deposit Com- pany of Philadelphia, by an instrument known as the "Assignment and Transfer in Trust," and the latter company issued thereon equip- ment trust certificates to the construction company in an amount equal to the sum secured by the contract. The construction com- pany pledged a million dollars or more in these certificates for loans to it by third parties, and some of these certificates remained pledged at the time of the execution of the Matheson–Palmer agreement. This agreement, with respect to this matter, provided, by its eighth article, in substance, that the construction company should assign to defendant all rolling stock and equipment, by assigning all equip ment trust certificates and other title, so that defendant should be vested with sole title to the rolling stock, and able to include the same under its mortgages, free and clear of incumbrance. This agreement upon the part of the construction company was subse- quently carried out, and all equipment trust certificates canceled. With respect to this subject, the answer of the defendant admits that the rolling stock and equipment were delivered to defendant under circumstances hereafter to be referred to. But it nowhere alleges that the lease contract of equipment was void or illegal, or that there was fraud in the transaction, or that the equipment trust certificates were void or illegal in the hands of the construction company. This transaction must therefore be treated as a legal act, and the certifi- cates valid and subsisting obligations against the railway company, as no issue is raised with respect thereto. If issue had been raised, we should agree with the disposition made of the matter by the court below. The answer does allege, however, that the construction com- pany was indebted to the railway company for equipment trust cer- tificates in the sum of $207,000, which constitutes an offset to plain- tiff's claim. We are now to see if this allegation finds support in the evidence. By the contract of May, 1884, between the railway company and the construction company, which was a general settle- ment contract, the construction company agreed to surrender, or cause to be, for purposes of cancellation, such and so many of the equipment trust one year certificates, series A, which became pay- able in June of that year, as the construction company possess and can surrender at the time of the delivery of that contract, as well as all of that series which should come into its possession or under its control, so that it can surrender the same, whether before or after maturity. It will be noted that this is not a contract to as- sign the certificates to the railway company. They were evidences of the railway company's debt, and the agreement, practically, is to cancel so much of that debt, made contingent upon the construction company's having or obtaining possession of the certificates. No time was fixed when this should be done. It therefore remained open of accomplishment at any time when the construction company

obtained the certificates. It is not at all necessary that we should follow out in detail the account as it appears upon the books, as it simply confuses the question and the rights of the parties. We have the facts. It may be assumed that this item became an indebtedness in favor of the railway company when the debenture bonds were issued, although until the Matheson-Palmer agreement was made they were worthless. But the railway company's equitable right then was, and was ever so, to have these certificates canceled, and when this was done all interest which the railway company ever had was protected. Now, what happened? The construction company entered into the Matheson-Palmer agreement, to which the railway company was a party, and it agreed to free this equipment of the liens of the trust certificates. The railway company assented to it, and the construction company performed its agreement by procuring and causing to be canceled the certificates. Where does any right presently exist in the defendant to say that because on the 30th day of September, 1886, there appeared on the books of the railway company a debt due to it by the construction company, that debt could not be wiped out on the 31st day of May, 1887, in exact compliance with the contract by which it was created? Or how could the railway company complain, if it were now a party? Accounts, however complicated, cannot be made the basis to keep alive a debt or obligation shown to have been canceled; and this debt, upon strictly legal grounds, as well as upon equitable principles, must be deemed canceled. With these facts established, the proper entry was made in the books in 1887. As thus completed, the books agree with the facts.

4. This claim is that no part of the $217,000 is applicable to the payment of debts due the construction company. The basis for this assertion rests in the claim that provision had been otherwise made for the payment to the construction company of all its claims, and more, in other provisions of the Matheson-Palmer agreement, and that the construction company, through its officers, fraudulently made up a false statement of the floating indebtedness of the railway company, and furnished the same to the representatives of Matheson & Co., upon their request, at the time the negotiations were pending which resulted in the Matheson-Palmer agreement, and that by reason of such false statement the persons representing Matheson & Co. were induced to insert the provision in the contract setting apart the sum which it did to pay the floating debts. So far as the claim is made that the Matheson-Palmer agreement excluded the construction company from participation in the fund, it cannot be upheld. As we have already seen, such agreement did not operate as a release of any claims of the construction company, except as therein specifically enumerated, and its floating claim was not so enumerated, and there is nothing in the provision which created this fund which excluded the construction company from its benefits. We must therefore proceed to consider the claim of fraud upon the presumption that Messrs. Smithers and Beaman knew that the provision which provided the fund for the payment of floating debts embraced

any company which held such debts, including the construction company, if any such debt existed in its favor. Consequently, when the statement was made up upon which it is said they exclusively acted, it must follow that they did not know, and could not know from it, a single individual or company embraced in the item ."individuals and companies," or, for that matter, in any other item; for not a single creditor is named therein which held the floating debt, or any part of it. If it was their purpose to know, and if they required the statement with the object of finding out, not alone the amount, but to whom the debts were due, then, confessedly, the statement failed to give any information upon the latter point, and did not intend or assume so to do. If the purpose was, in asking for a statement of the floating indebtedness, to obtain therefrom a knowledge to whom it was due, then, evidently, we must conclude that such purpose was by them abandoned, as they obtained no such information, and, so far as appears, were content with the information received; and this related alone to the amount due, and not to whom due. In this view, we are prepared to concur in the opinion expressed by the court below and by Judge Wheeler, that it was the amount of indebtedness which Messrs. Smithers and Beaman regarded as the important thing, and that they were not concerned with the question to whom it was due; and in consequence such question is not important now. It is therefore evident that they could not have been misled to their prejudice by this statement. But we may go further than this. It is to be noted that nearly the whole amount of the construction company's claim is embraced in the item of $145,407.38, which was set forth in the balance sheet of the railway company of June 30, 1886, which formed the basis of the statement. The statement of the amount due to individuals and companies was made up by consolidating items of indebtedness due from the railway company, including the claim of the construction company, and deducting certain credit items, which left the balance stated as due to individuals and companies, $110,739.83. These items were all upon the balance sheet, furnished the data from which the sum was easily reached, and to the extent to which plaintiff's present claim, upon this branch of the case, is established, represented, in all respects, perfectly honest debts. Why, then, should fraud be imputed to any person in this connection? It is said that the agreement would not have provided for any further claim of the construction company, had it been known that the floating indebtedness was practically the construction company's claim. Where is the evidence in support of such claim? The agreement did not so state, and, as we have seen, did not so operate, either in the clause setting apart the money, or in its other parts. No one is called upon to testify that further provision was not intended to be made for the construction company, or that it was intended to limit the fund to debts due other parties, or that Smithers and Beaman were misled or lulled into acquiescence, or that any conversation or oral negotiations were had which limited in effect this provision of the agreement. On the contrary, no such claim was ever made, so far as appears in the record, in any of the

negotiations before or subsequent to the agreement, until after the commencement of this action. It is not necessary to consider whether, in fact, Smithers and Beaman had the balance sheet before them at this particular time or not. It would certainly be a surprising fact, in view of the negotiations and their character, if they did not acquaint themselves with the character of this paper and its contents. They undoubtedly had the right to rely upon the statements made by the officers of the company as true in all essential particulars, and could justly and legally complain of misleading and untrue statements. But, in a legal sense, we are not able to see that this statement was misleading, or in any essential respect untrue; and it, in fact, represented just claims then due in whole or in part. We may not, therefore, conclude that this act, or the circumstances surrounding it, was sufficient to defeat plaintiff's claim, and are therefore unable to sustain defendant's appeal in any of its parts.

Respecting plaintiff's claim to recover the additional sum of $80,000, the substantial facts are admitted by the answer, and, in brief, are as follows: The railway company, needing money to pay interest, made eight promissory notes, which were indorsed by the construction company, and the money realized therefrom was paid to the railway company. In order to obtain the money, the construction company loaned to the railway company, among other securities, 8,000 shares of stock of the railway company, which the former pledged as collateral security for the payment of the notes. This loan of stock was accompanied by an agreement whereby the railway company agreed to return the stock loaned, or pay therefor $10 a share, and keep the construction company indemnified from liability upon the notes. The $40,000 was obtained by the construction company of Charles S. Hinchman, upon the securities pledged, accompanied by an option, executed by the railway company, to take the stock at any time before the maturity of the notes, in payment therefor, at $5 per share. Hinchman exercised this option by taking 8,000 shares, at $5 per share, and discharged the notes. The construction company demanded a return of the shares of stock thus loaned, or payment therefor as provided in the contract, with which demand the railway company never complied. The answer concedes that the securities which were loaned were the property of the construction company. It is clear, therefore, that to the extent of the $40,000 which it is conceded the railway company had and used for its purposes, and which it has never repaid, a liability was created against it which is properly chargeable against this fund. The court below has so held, and we see no reason for disagreeing with that conclusion. Both Judge Wheeler and Judge Cullen rejected the claim for the bonus to be paid for failure to return this stock. We think the construction correct which holds that this claim for failure to return the stock did not exist as an indebtedness in the sense in which that term was used in the Matheson-Palmer agreement, and was not, therefore, such indebtedness as was contemplated by it or embraced within it, or to which the fund was to be applied. The claim, to this extent, was therefore properly rejected.

So far as plaintiff's appeal is concerned, except as the questions presented have already been disposed of, we do not deem discussion, beyond two questions, necessary:

The court below, in adjusting the plaintiff's account, struck therefrom an item of $23,962.09, which plaintiff now claims was error. We have examined the argument presented in favor of the claim with care, and, not without hesitation, agree with the conclusion reached by the court below. We do not agree with the appellant that the question presented is solely one of law, but conclude that it presents alone a question of fact. The transaction between the construction company and the railway company relating to this item was not a sale of the material, but a transfer by which the construction company sought to protect and place the property beyond possible reach of creditors, so that construction or operation might proceed in the event the latter company became financially embarrassed. It is needless to set out in detail the accounts which evidenced this transaction. By the omission of this item from the reverse entries of the transaction in the books, and the presence of other reverse entries relating to the property, it is asked that inference be made of a subsequent actual sale of material to the railway company of this amount. This inference is based upon the fact that the property, when last heard of, was in the custody of the railway company; that the books evidenced the change; that the entries were properly made by honest and competent men; that the charge was undisputed for nine years, and was not discovered or complained of by the person who made the entries; and that practically the whole item of the pledged material was accounted for in the reverse entry. As an offset to this, it was testified by Webb that this item should have formed a part of the pledged-material account; that there is no evidence of any actual sale; and that, while the railway company was the actual custodian of the property when Webb last saw it, yet it was then the property of the construction company; and claim is made that, as such, it entered into the account current, where the construction company had credit for it. We might have reached a different conclusion respecting this item. But upon no legal principle can we disturb the finding. Baird v. Mayor, etc., 96 N. Y. 567.

The court below held that this was an equitable action, and that defendant was to be treated as a trustee of this fund. We coincide with this view. Its only importance here is in its bearing upon the question of interest. We agree with the court below that defendant was entitled to a reasonable time to ascertain the claim, and for demand of payment to be made. The companies themselves had always allowed interest in their current accounts against each other, so that the right to the interest item, as established, existed as a debt in favor of the construction company. Equitably, in view of defendant's trusteeship, and of the rights of all creditors, interest was suspended for a reasonable time to permit of an accounting and discharge of the debts. During that time defendant is properly chargeable with the interest received upon the fund, from the time of its reception to the date when it should reasonably have discovered and

paid the debts. If it failed to exercise diligence, or unreasonably resisted the payment of a just claim, then it should, equitably, be charged with what the money would earn at the legal rate from the date of its failure or unwarrantable resistance. We find no error in the allowance of interest upon the fund for which the defendant is to account up to the 14th day of April, 1890. From that date it should be chargeable with interest at the legal rate. So far as plaintiff is concerned, we think it clear that he becomes entitled to interest upon his claim, as established, at legal rates, from the time when, under the rule assumed by the court, defendant should have paid. The defendant on the latter date had paid and adjusted all debts provided for in the fund, except to the construction company. Prior to this date,—but at just what time does not appear, although defendant states that it denied liability in 1888,—the construction company had demanded its money. Such fact is recited in the agreement of arbitration. Upon this date we think there is no doubt that the equitable claim of the construction company for interest upon its established claims began to run. In this view, the decision as to interest should be modified by charging defendant with interest upon the fund in its hands from April 14, 1890, at the legal rate, and by allowing plaintiff interest upon claims, as established, from the same date. The limits of an opinion have long since been passed in this discussion, and it would serve no useful purpose to further advert to the details of the respective claims of the parties. We have examined them all, and find no substantial error in the decision of the court below respecting the same. We are also of opinion that the claim for damages for revocation of the arbitration was correctly determined.

The judgment appealed from will be modified, so far as the interest items are concerned, as herein indicated, and as so modified should be affirmed, with costs to the plaintiff. All concur.