SUGG v. SMITH et al. (No. 5759.)

(Court of Civil Appeals of Texas. Austin. May 23, 1918.)

1. USURY ☞127—PERSONS NOT PARTIES TO CONTRACT.

Plaintiffs not being parties to a usurious contract, and having acquired no rights based upon such contract, the contract affords them no grounds for relief against defendant, the lender under the contract.

2. CORPORATIONS ☞579(1) — USURY — RIGHT OF SUCCESSOR CORPORATION — AMALGAMATION—MERGER—CONSOLIDATION.

Where borrowing companies conveyed all their property to the lender to satisfy indebtedness, which was usurious, and the lender conveyed to a new company formed to unify business of borrowing companies, the new company could not avail itself of fact of usury in contract between lender and borrower companies, transaction not constituting an "amalgamation," "merger," or "consolidation" of borrower companies.

3. USURY ☞127—RIGHT TO PLEAD.

Where new company, as principal, and stockholder, as surety, pursuant to transactions between the old companies and a lender to them, agreed to pay indebtedness of old companies to lender, new company and its stockholder, as against lender, are not entitled to plead usury as to transactions between lender and old dissolved corporations.

4. STATUTES ☞239, 241(1)—PENAL STATUTES—CONSTRUCTION—STATUTORY RULES.

By Rev. St. 1911, Final Title, § 3, penal statutes and those in derogation of the common law must be liberally construed with a view to effect their objects and to promote justice.

5. CONSTITUTIONAL LAW ☞14 — CONSTRUCTION.

Unless the context indicates otherwise, the language of the Constitution is to be given its ordinary signification.

6. STATUTES ☞188—CONSTRUCTION.

Unless the context indicates otherwise, the language of statutes is to be given its ordinary signification.

7. USURY ☞100(2) — RIGHTS OF DEBTOR—CREDIT OF USURIOUS INTEREST UPON PRINCIPAL—STATUTE.

In view of Const. art. 16, § 11, as to interest and usury, Rev. St. 1911, art. 4982, enacted 1892, authorizing recovery of double amount of usurious interest paid, did not abrogate existing rule concerning application to principal of payments made upon usurious interest.

8. STATUTES ☞165—CONSTRUCTION—REPEAL OF PENALTY.

When the law prescribes one penalty for its violation, and thereafter the Legislature prescribes another, proper construction requires holding that latter penalty supersedes and repeals former.

9. USURY ☞100(2)—ELECTION OF DEBTOR.

Under Const. art. 16, § 11, as to interest and usury, and Rev. St. 1911, art. 4982, authorizing recovery of double amount of usurious interest paid, in case of usury debtor has election to sue for penalty, or to have amount paid as usurious interest credited upon principal.

10. BILLS AND NOTES ☞126 — ATTORNEYS' FEES—CONTRACT FOR INDEMNITY.

Obligations to pay attorneys' fees, stipulated in notes, are contracts for indemnity only, and obligee is entitled to collect only a fair amount as fees, though less than per cent. stipulated.

11. COMPROMISE AND SETTLEMENT ☞6(1)—CONSIDERATION.

Act of creditor in releasing portion of attorneys' fees stipulated in notes did not constitute consideration for compromise contract of settlement as detriment to him, unless amount agreed to be accepted by him was less than fair compensation for services rendered by attorneys.

12. USURY ☞89—PAYMENTS BY INDORSER.

Payments of money or property made by an indorser upon notes of a corporation, he being a party to the notes, and to the corporation's suit against the lender, constituted usury, if thereby the lender obtained more than 10 per cent. per annum as compensation for the use of his money by the company.

13. USURY ☞65—COMPENSATION FOR USE OF MONEY—EXTENSION OF TIME FOR PAYMENT.

If a transaction between a company, the indorser of its notes, and the payee, was intended as compensation for the use of the payee's money, and was more than 10 per cent. per annum, the transaction was usurious, but if it was compensation for the payee's agreement to extend time for payment of the notes, it was not usurious.

14. ACTION ☞50(2) — MISJOINDER OF PARTIES AND CAUSES OF ACTION—USURY.

There was no misjoinder of parties plaintiff and causes of action because a corporation, which borrowed at usurious interest, and its stockholder, the indorser of its notes, sued together to recover separate penalties from the payee, especially after the payee filed his cross-action and sought to recover against both the corporation and its indorser.

Appeal from District Court, Bell County; Jno. D. Robinson and F. M. Spann, Judges.

Suit by N. K. Smith and another against J. D. Sugg. From judgment for plaintiffs, defendant appeals. Reversed, and case remanded.

Davis & Davis, of Gainesville, Ward & Evetts, of Temple, Williams & Williams, of Waco, and Bryan, Stone & Wade, of Ft. Worth, for appellant. A. L. Curtis, of Belton, W. W. Hair and Winbourn Pearce, both of Temple, Spell & Sanford, of Waco, and A. H. Culwell, of El Paso, for appellees.

KEY, C. J. We copy from appellees' brief the following substantially correct statement of the pleadings of the respective parties:

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"N. K. Smith and Mid-Tex Oil Mills, as plaintiffs, filed this suit on the 5th of January, 1915, against J. D. Sugg, as defendant, and, among other things, alleged, in substance, that about May, 1904, the Belton Oil Company, a private corporation operating an oil mill at Belton, Tex., passed a resolution authorizing its president, N. K. Smith, to execute a contract with defendant whereby defendant was to make a loan of $20,000 for the benefit of the Belton Oil Company, and to become the holder of certain of its mortgage bonds as security, and by which defendant was to be given the option to furnish necessary funds for the operation of the business of Belton Oil Company during the seasons of 1904 and 1905, and so long thereafter as said Sugg might be a holder of said mortgage bonds or any part thereof, and whereby it should be agreed that, in addition to the usual rate of interest, the said Sugg should receive 10 per cent. of the net profits of said mill for such seasons as he might furnish such funds; that shortly thereafter the Belton Oil Company, acting through its president, N. K. Smith, entered into a contract in writing, whereby, in consideration of said loan of $20,000, which loan was evidenced by a note signed by N. K. Smith and C. B. Smith, and secured by collateral mortgage bonds of the Belton Oil Company, said Belton Oil Company agreed and obligated itself to give said J. D. Sugg option to finance its business for the crushing seasons of 1904 and 1905, and during the continuance of said indebtedness, and that it would pay him 10 per cent. of the net profits of said mill earned in the respective seasons that he should finance the same in addition to the regular rate of interest to be paid on all funds used in such financing; that on the same date, about the 28th day of May, 1904, in pursuance of this arrangement, the $20,000 note was executed, bearing interest at the rate of 8 per cent. per annum from date; that said note was executed by N. K. Smith and C. B. Smith, with the collaterals of the oil mill attached, and with the understanding that said loan was being made for the benefit of said Belton Oil Company, N. K. Smith being at that time and at all times thereafter the president of said company and the owner of a majority of the capital stock of same; that shortly thereafter the said Sugg did begin to finance said Belton Oil Company for the seasons of 1904 and 1905, and continued to do so until the final dissolution of said Belton Oil Company in the year 1911; that at the time of the adoption of said resolution and at the time of the execution of said note J. D. Sugg had agreed to loan the $20,000 and to finance said mill for the seasons of 1904 and 1905, providing the Belton Oil Company would agree to pay him 10 per cent. of the net profits and earnings of said mill in addition to the regular rate of interest to be paid him, and that it was in pursuance of such agreement that the Belton Oil Company entered into said contract and obligation in writing, agreeing to pay 10 per cent. of the earnings of said mill in addition to the usual rate of interest; that during the seasons of 1904 and 1905 various promissory notes for moneys loaned by J. D. Sugg were executed by Belton Oil Company and N. K. Smith; that all of said notes were usurious, and that all loans as represented by them were made by J. D. Sugg in pursuance of the 10 per cent. profit agreement in addition to the regular rate of interest: that the profits in contemplation of the parties at the time were to be large, and that same, when added to the rate of interest provided for in said notes, would represent an amount largely in excess of 10 per cent. interest per annum; that by reason of the foregoing all interest provided for in said notes was forfeited, and that all payments should be applied to the principal amount due on same, and that it should be determined that said notes bear no interest from the date of their execution. The payments made

on said notes were fully set out. That the total amount of the credits aggregate $83,248.13, of which the sum of $3,342.20 was applied as credits upon said note for $20,000, the remainder of which amount, to wit, $79,905.92, should be applied as a credit on the principal amounts due upon the remaining notes, the total amount of which aggregated for the seasons of 1904 and 1905 and 1905 and 1906 the sum of $95,000, leaving a balance due on said notes of $15,094.08.

"That about July 2, 1906, in consideration of the usurious agreement then in existence between the parties, and in consideration of an extension and renewal agreement for the balance due on said notes, plaintiff Smith, acting for himself and for the benefit of the Belton Oil Company, being at that time also president and owner of a majority of the capital stock in Bartlett Oil Mill, a private corporation engaged in conducting an oil mill at Bartlett, Tex., transferred and sold to J. D. Sugg capital stock of said Bartlett Oil Mill of the par value of $2,500; that J. D. Sugg purchased this stock of N. K. Smith, and in consideration therefor agreed to credit the indebtedness claimed to be owing by the Belton Oil Company; that said Sugg bought this stock and agreed to pay therefor par value for same, and that plaintiffs are entitled to have said $2,500 applied as a credit on the principal amount due on said notes, leaving a balance of $12,594.08; that on or about the last-mentioned date, July 2, 1906, a renewal note was executed by the Belton Oil Company and N. K. Smith in consideration of an extension in time of payment of the balance due on all said notes, except the $20,000 note, which renewal note was executed, not for the amount actually due, to wit, $12,594.08, but for the principal sum of $22,000, and secured by attached mortgage bonds of the Bartlett Oil Mill, and that said note was executed by the Belton Oil Company, Bartlett Oil Company, and N. K. Smith; that this note was usurious, and was executed in pursuance of a contract, both verbal and in writing, to pay, in addition to the rate of interest provided for in said note, same being 8 per cent., an amount equal to 10 per cent. of all profits to be made by the Belton Oil Company and the Bartlett Oil Mill in their respective businesses; that said note was also usurious, and that the principal sum of $22,000, which included the usurious charges, payments, and exactions which had theretofore been agreed upon and paid by the Belton Oil Company and N. K. Smith, and because of the fact that much less than $22,000 was actually due and payable to J. D. Sugg; all other notes executed for loans made by J. D. Sugg to the Belton Oil Company, to the Bartlett Oil Mill, and to Granger Oil Mill were fully set out and described, said Granger Oil Mill being a private corporation doing an oil mill business at Granger, Tex., all of said notes being alleged to be usurious; that it was within the contemplation of the parties at the time said notes were given, and at the time the contracts and agreements as to the extra interest and bonuses were made, that the value of 10 per cent. of the profits of said oil mills, all of which was agreed upon, would be greatly in excess of the lawful rate of interest, and that the profits, added to 8 per cent. provided for in said notes, would be greatly in excess of 10 per cent. per annum of said notes; that all of the notes were signed by N. K. Smith and indorsed by him before they were delivered to J. D. Sugg, was primarily liable and an original obligor on same.

"The respective payments made on all of the foregoing notes were fully set out, showing that a balance was due J. D. Sugg of $140,620.18 on July 1, 1908; that prior to that time, about March 30, 1908, N. K. Smith, acting for said corporations and for himself as the owner of a majority of the capital stock in each of them, and for himself individually, as the maker and

indorser on said notes, did sell and transfer to J. D. Sugg capital stock in said Granger Oil Mill for $5,000; that on July 1, 1908, he likewise sold and transferred to him capital stock in the Bartlett Oil Mill for $2,500, and that about said date he also transferred and sold to him capital stock of said Belton Oil Company of the par value of $2,500; that J. D. Sugg, in the purchase of said stock, agreed to pay therefor an amount equal to the par value of said stock, and to apply the purchase price thereof as credits on the indebtedness claimed to be due him by said corporations, and by N. K. Smith, leaving a balance of $130,620.18 as due on July 1, 1908, at which time a renewal and extension agreement was entered into, and that new notes were given, not for the amount actually due as aforesaid, but new notes were executed by the Belton Oil Company, the Bartlett Oil Mill, and the Granger Oil Mill, payable to J. D. Sugg, for the respective amounts of $100,000 and $75,000; that each of these notes was a usurious contract, and included usurious interest, charges, exactions, and profits heretofore mentioned, and which had been paid to J. D. Sugg, and included in the amount claimed by him to be due as represented by these notes in renewal; that said notes were also usurious contracts in writing for the reason that at the time of their execution J. D. Sugg and said corporations and N. K. Smith did enter into and continue an agreement to pay, in addition to the 8 per cent. provided for in said notes, an additional amount equal to 10 per cent. of all profits, to be made by said Oil Mills, and that it was within the contemplation of the parties that said 10 per cent. of profits would represent an amount, when added to the rate of interest provided for in said notes, greatly in excess of 10 per cent. per annum. All other notes executed prior to July, 1911, were fully described, and the payments and credits made thereon fully set out, which payments and credits, when deducted from the amount of principal due, left a balance of $132,114.20 actually due and owing J. D. Sugg as of date July 17, 1911.

"It was further alleged that it was the intention and purpose of the defendant J. D. Sugg, at the time he entered into the contracts for the bonus of 10 per cent. profits of said oil mills, to receive from and exact of the plaintiffs for the loan of said moneys an amount in excess of 10 per cent. interest; that the plan of charging 8 per cent. interest on the face of said notes, and in addition thereto 10 per cent. of the net profits of said mills, was formed and designed as a device and subterfuge and as a cloak to cover the charges of usurious interest on said loans and advances, and that in fact during many of the crushing seasons of said oil mills, for which seasons J. D. Sugg advanced and loaned moneys for the purpose of operating the oil mills, a bonus of 10 per cent. of the net profits, when added to the rate of interest provided for in the notes given to represent the loans, was greatly in excess of 10 per cent. interest, and that J. D. Sugg did, in fact, receive during many years and crushing seasons an amount as interest in excess of 10 per cent.

"That on or about July 17, 1911, at which time said corporation and N. K. Smith were indebted to J. D. Sugg in the principal amount last mentioned, $132,114.20, the said N. K. Smith having signed all of the notes executed in consideration of the loans made, at which time J. D. Sugg, taking into consideration the usury and bonus and interest demands, claimed an indebtedness due him, aggregating $227,131, at which time the said J. D. Sugg formed a design to accomplish the reorganization, amalgamation, and consolidation of the affairs represented by the three corporations, and for the purpose, as he thought, of better securing the indebtedness claimed by him to be due him;

that about that time, at his instance and suggestion, a plan was formed to effect the dissolution of the old corporations and to perfect the consolidation of the same, and with that purpose and object in view, and as a part of such plan, and without any purpose or intention either on the part of J. D. Sugg or either of said corporations, or the stockholders or officers of either of them, to liquidate the indebtedness due J. D. Sugg, but with the purpose, understanding, and agreement of all parties concerned that the said J. D. Sugg was to, in fact, extend the time for the payment of the amount claimed to be due by him, and to thereafter enter into a renewal providing for such extension, and as a part of such plan and in compliance with the purpose, and within the scope of such understanding and agreement, the dissolution of the three old corporations was accomplished, and a corporation known as the Mid-Tex Oil Mills, one of the plaintiffs herein, was organized and created; that in pursuance of such plans the physical properties theretofore belonging to the old corporations were conveyed to J. D. Sugg, it being stated in the deeds of conveyance that the consideration for same was the cancellation and liquidation of the indebtedness due to J. D. Sugg; that the consideration, as stated in said conveyance, was not in fact the true consideration, said conveyance being made solely in pursuance of the scheme, plan, and purpose mentioned to accomplish the dissolution of the three old corporations and to effect the organization of a new corporation; the stockholders in the old corporations became the owners of the stock in the new corporation in proportion to their holdings of stock in the old corporations, on a basis of a capitalization of $250,000 in the new corporation, and it being the purpose from the beginning of such plan and design, and it being the agreement and understanding of all parties concerned, that the new corporation to be formed should become responsible for and make and execute notes for the indebtedness claimed to be due J. D. Sugg; that the dissolution of the three old corporations and the organization of the new corporation, to wit, the Mid-Tex Oil Mills, had for its purpose, and in fact accomplished, the consolidation of the affairs of the three old corporations, and that the Mid-Tex Oil Mills, since it was organized and created, has represented all of the affairs of the three corporations above referred to; that in its creation and organization and since that time it has represented the assets, properties, and affairs of the three dissolved corporations, and all the properties of the three old corporations became the properties of the new corporation; that it was the understanding and agreement made and entered into between the three old corporations, J. D. Sugg, and all parties concerned that the properties of the old corporations should be first conveyed to J. D. Sugg, stating in the conveyance as a consideration therefor the cancellation of the indebtedness due him, with the understanding that he would hold the title to all of said property in trust for the benefit of the new corporation to be formed, and that he would immediately thereafter convey all of said properties to the new corporation, reserving in the deed of conveyance a lien to better secure the indebtedness which he claimed to have been due him by the old corporations, which plan was accomplished, and which was thereafter made by J. D. Sugg to the Mid-Tex Oil Mills, and which said Mid-Tex Oil Mills it was agreed and in fact did execute a deed of trust on all of said properties for the purpose of better securing J. D. Sugg in the indebtedness claimed by him to be due; that, upon the creation of the Mid-Tex Oil Mills, N. K. Smith, by virtue of being the owner of a majority of the capital stock of the old corporations, according to the plan and purpose of the dissolution of the old corporations and the consolidation of their af-

fairs by the creation and organization of the new corporation, became the owner of a majority of the capital stock of said Mid-Tex Oil Mills, and according to the understanding and agreement made and entered into with J. D. Sugg before such dissolution, and in pursuance thereof, there was assigned and issued to J. D. Sugg, in lieu of the shares of stock which he had theretofore held in the dissolved corporations, capital stock of Mid-Tex Oil Mills to the amount of $20,500, as representing the stock to which he was entitled by virtue of his ownership of stock in the dissolved corporation.

"That at the time Mid-Tex Oil Mills was organized and created in pursuance of the plan, design, and purpose which has heretofore· been mentioned, there was entered into a renewal and extension agreement with J. D. Sugg relative to all the indebtedness which he then claimed was due and owing to him by the old corporations and N. K. Smith, and, in pursuance of the plan heretofore alleged, new notes were executed by the Mid-Tex Oil Mills and payable to J. D. Sugg, and indorsed by N. K. Smith in renewal and extension of the indebtedness then claimed to be due by them to J. D. Sugg; that these notes were not executed for the amount actually due, to wit, $132,114.20, but two notes were executed for the respective amounts of $127,131 and $100,000; that each of these notes carried forward and there was included in them all of the usury exactions and bonuses heretofore described; that each of the owners of stock in the three old corporations became the owners of stock in Mid-Tex Oil Mills according to their respective holdings, so that the Mid-Tex Oil Mills and the owners of stock therein in fact represented all the rights and privileges of the dissolved corporations, and said Mid-Tex Oil Mills in fact represented nothing more than the rights, properties, and affairs of the three dissolved corporations; that the purposes of the officers, directors, and stockholders of the old corporations in effecting the dissolution and reorganization was to satisfy the demand of_J. D. Sugg, it being the understanding and agreement that if this were done, and the new corporation, Mid-Tex Oil Mills, organized, that said J. D. Sugg would extend the time of payment for said indebtedness, and would take renewal notes of the corporation, to be indorsed by N. K. Smith, for said indebtedness. The deed of trust describing the foregoing notes was fully set out, including a description of the properties. That on the same date, July 17, 1911, plaintiff N. K. Smith, also executed and delivered deed of trust on certain property belonging to him, naming C. C. Kirkpatrick as trustee, the same being made and executed for the benefit of J. D. Sugg to secure said notes, fully describing the deed of trust and the property covered therein; that on or about July 30, 1912, J. D. Sugg, at that time claiming that all the notes which had been executed by plaintiffs were past due, entered into a renewal and extension agreement with the Mid-Tex Oil Mills and N. K. Smith in writing, by which it was agreed that he would extend the time of payment of the two last-mentioned notes, and that in consideration of such extension the Mid-Tex Oil Mills should do and perform certain things, and that certain precedent conditions should be complied with, and provided, among other things, that the collateral agreement entered into on that day by and between J. D. Sugg and N. K. Smith, the said Smith· being referred to therein as the indorser of said notes and the owner of a majority of the capital stock in said Mid-Tex Oil Mills, should be complied with; that on the same day, to wit, July 30, 1912, J. D. Sugg and N. K. Smith made and entered into their collateral, contemporaneous, and extension contract and agreement in writing referred to above, wherein it was provided that in consideration of the extension agreement made and entered into,

that J. D. Sugg, N. K. Smith; on or before June 1, 1913, 1914, 1915, and 1916, each assign, transfer, and deliver, free of incumbrance to J. D. Sugg, capital stock in the Mid-Tex Oil Mills of the par value of $25,000 on a basis of $250,000 capitalization, making a total of $100,000 of the capital stock of the Mid-Tex Oil Mills to be transferred and delivered to J. D. Sugg; that the capital stock was at that time, and has at all times hereafter, been of the reasonable market and intrinsic value of $100,000; that said agreement provided for a greater rate of interest than that allowed by law, to wit, 10 per cent.; that the same was usurious, and that said notes were also thereby tainted with usury and void, except as to the amount of principal remaining due to J. D. Sugg, upon the loans heretofore mentioned, after applying all payments and credits and satisfaction of the principal amount. All other notes thereafter executed were fully described and the payments fully set out. The amount of interest and bonus payments during the two years preceding the filing of this suit were also fully alleged. That one note was executed on August 10, 1914, by the Mid-Tex Oil Mills, payable to J. D. Sugg for the principal amount of $11,000; that said note represented a usurious contract in writing in that, in truth and in fact, J. D. Sugg only advanced the Mid-Tex Oil Mills the principal amount of $10,000; that this note was to mature nine months after date; that $1,000 was added to the amount loaned, representing the interest of said note to maturity, and was in excess of 10 per cent.; that said note as to the extra $1,000 was void; that on or about June 30, 1913, acting in pursuance of the usurious contract made in 1912, N. K. Smith did transfer and deliver to J. D. Sugg, in Bell county, Tex., 250 shares of stock in the Mid-Tex Oil Mills; that deducting the payments made to J. D. Sugg from the principal amounts due leaves a balance of $71,265.99, not taking into account any interest or bonuses paid him during the two years next preceding the filing of the suit; that there was paid to J. D. Sugg, and that he had received as interest and bonuses on said loans since January 5, 1913, and within two years next before the filing of this suit, as cash or its equivalent, the sum of $55,427.79; that about January 26, 1914, J. D. Sugg claiming that the two notes heretofore described as having been executed on July 17, 1911, were past due, a renewal and extension agreement was entered into between J. D. Sugg and plaintiffs herein, and J. D. Sugg, claiming that the sum of $181,000 was due him at that time, entered into a renewal contract and agreement with the Mid-Tex Oil Mills, by the terms of which he retained in his possession the last two notes, and caused to be executed renewal notes, which are fully set out and described in the pleadings of all parties hereto, plaintiffs representing that they are entitled to recover as penalties of J. D. Sugg double the amount of all interest received and collected by him within two years next preceding the filing of this suit, upon all of said usurious contracts, all of which was alleged to have been paid to· J. D. Sugg and received by him in Bell county, the same to include double the amounts of the money actually paid as well as double the amount of the value of the $25,000 capital stock of the Mid-Tex Oil Mills. Plaintiffs ask for the cancellation of all the notes, liens, and deeds of trust held by J. D. Sugg, for the removal of the cloud to the title of their property, and for a judgment against J. D. Sugg for the remainder of their recovery on penalties after first satisfying all principal indebtedness due defendant.

"The defendant answered, with various exceptions, to plaintiffs' petition, and made specific admissions and denials to plaintiffs' petition. It admitted the contract made in May, 1904, with Belton Oil Company and N. K. Smith to

the effect that the Belton Oil Company and N. K. Smith were to pay one-tenth of the net profits of the oil mill in addition to interest, as provided for, and admitted that a written contract was entered into between defendant and the Belton Oil Company providing for same, substantially as alleged in plaintiffs' petition, and that the money was so loaned by the defendant under the understanding that he should receive 10 per cent. of the net profits of the mill in addition to interest thereon at the rate of 8 per cent. per annum, and admitted that during the course of defendant's dealings with the said Belton Oil Company that he likewise made loans to the Bartlett Oil Company and the Granger Oil Mill, and that all of said corporations executed their notes for such loans under the agreement that 10 per cent. of the net profits of all said mills should be paid to him, in addition to the rate of interest called for in the obligation.

"The defendant specially denied in his answer that it was his purpose or intent, by the contracts for 10 per cent. of the net profits of the mills, to receive or exact in excess of 10 per cent. per annum, and denied that said contract was a device, subterfuge, or cloak to cover the exaction of usurious interest on loans. It was further denied that the defendant controlled the three oil companies in bringing about a dissolution of the old companies and their reorganization of the Mid-Tex Oil Mills, and alleged that the acts of said companies were free and voluntary; that each of said companies concluded to dissolve and go out of business, but, before doing so, desired to pay its indebtedness to the defendant, and that pursuant to such intent each of said companies conveyed its property to the defendant in satisfaction of the amount which he claimed at that time to be due him, to wit, the sum of $227,131, and that they were thereupon released from all obligation and fully discharged, and that the defendant accepted said property with the verbal understanding that when the new company was formed which was then contemplated he would convey said property to such new company in consideration of its assuming and securing, according to its face and tenor, the indebtedness which he theretofore held against said three companies; that pursuant to said intent said Mid-Tex Oil Mills was incorporated, and defendant conveyed to it property which he had acquired from the three old companies, and in consideration of that conveyance said Mid-Tex Oil Mills executed to him its two notes aggregating $227,131, secured by a vendor's lien upon said property and by deed of trust.

"Defendant alleged that he accepted said deeds from the three old companies in satisfaction of their respective indebtedness to him, and that thereby said three companies were released from said indebtedness or any part thereof; that the defendant did accept said conveyances from the old companies with the understanding that he would convey the property to the Mid-Tex Oil Mills, and that, pursuant to such understanding, defendant did convey said property to the Mid-Tex Oil Mills when chartered.

"Defendant further alleged that the two vendor's lien notes heretofore mentioned were in fact due and payable on July 30, 1912; that the plaintiffs requested an extension for the time of payment of said notes, and that the plaintiff Smith, in consideration of the benefits accruing to him from the management and control of the affairs of said Mid-Tex Oil Mills, agreed, as alleged, to transfer and assign to the defendant $100,000 of the capital stock of said Mid-Tex Oil Mills in installments of $25,000 each, as therein stated, which stock was alleged to be estimated to be of the value equal to 2 per cent. per annum on the indebtedness of said Mid-Tex Oil Mills to the defendant, and was intended to secure the defendant in the payment of interest on said indebtedness at the rate of 10 per cent.

per annum, including the 8 per cent. specified in said notes, and said agreement was afterwards abrogated.

"Defendant alleged it was true, as alleged in the thirty-first paragraph of the petition, that on or about August 10, 1914, the Mid-Tex Oil Mills executed to defendant its promissory note for $11,000; that said Mid-Tex Oil Mills, through its agent, plaintiff Smith, approached the defendant for a loan of $10,000, representing that it was necessary to procure said money in order to put its mill in operation; that the defendant agreed to loan the $10,000 at the rate of 10 per cent. per annum, provided A. W. Storrs would indorse the note; that the defendant, pursuant to said agreement, advanced and loaned to the said mills said sum of $10,000, and said mills executed its note, as set forth in said paragraph, payable nine months thereafter, and mailed the same to the defendant, and the defendant put the note away without examining it, and did not discover until after the institution of this suit that said note was so framed as to include interest at the rate of exceeding 10 per cent. per annum.

"Defendant further alleged that about the 30th day of June, 1913, plaintiff Smith, in Bell county, Tex., did transfer and cause to be delivered to him 250 shares of the capital stock of said Mid-Tex Oil Mills, but not pursuant to the contract therein mentioned, but under a different contract made at the time of the delivery of such stock, by which the defendant accepted said stock at a valuation much less than its face value; that said transfer of stock was intended in part to pay to the defendant the difference between 8 and 10 per cent. upon the indebtedness to him; that on January 26, 1915, all the notes held by the defendant were renewed by execution of eight new notes, aggregating $181,000, as fully described; that the Mid-Tex Oil Mills is estopped and barred from claiming any defense on account of any dealings between the defendant and the three old companies, and that in the settlement between the parties had on the 26th day of January, 1914, all of the matters alleged in the petition of the plaintiffs were considered, adjusted, and finally settled, and that any demand of the plaintiffs or either of them, real or imaginary, against the defendant on account of usurious interest paid, or supposed to be paid, were for a valuable consideration released, surrendered, and relinquished.

"Defendant further alleged that plaintiff ought not to have and maintain this action against said defendant for penalties on account of usury paid because he says that, if such cause of action ever accrued to plaintiff or either of them, the same so accrued more than two years prior to the commencement of this action.

"That from 1904 to 1911, inclusive, the defendant and said Belton Oil Company, Bartlett Oil Mill, and Granger Oil Mill, met each year and settled all the transactions mentioned in the petition of the plaintiffs, and that in each of said settlements the said mills were allowed all credits to which they, or either of them, were entitled, and notes were executed for the balance then ascertained to be due defendant; that the three oil mills during their existence acquiesced in each of said settlements, and that the Mid-Tex Oil Mills assumed and agreed to pay the two notes heretofore mentioned, and that the plaintiffs and each of them are barred by laches and delay and by the law of limitation from questioning said settlement or disturbing the same. By way of plea of reconvention against the plaintiffs, the defendant asked for judgment on the right notes mentioned in the thirty-third paragraph of plaintiff's petition, and for a foreclosure of their vendor's lien and deed of trust liens."

At the trial the court, after giving to the jury instructions embodying the substance of the statute relating to usury, submitted the

case to them upon numerous special issues, and upon the answers returned by the jury judgment was rendered against the defendant, Sugg, for $10,927.88; and it is stated in appellant's brief, and not controverted by appellees, that in order to reach that result the court applied to the principal debt all payments made prior to January 5, 1913, whether on principal or interest, and all payments on principal thereafter made to the principal, and allowed a recovery for twice the amount of interest paid after January 5, 1913.

### Opinion.

The large amount involved in this case, the important and difficult questions of law so ably discussed by counsel for the respective parties, the fact that judges cannot always readily agree where the questions are numerous and difficult, and other circumstances not necessary to be incorporated in this opinion, constitute this court's excuse for holding the case under consideration longer than usual.

Appellant's printed brief and supplemental argument comprise about 175 pages, and appellees' brief contains 169 printed pages. The assignments of error are too numerous to be considered in detail; and it is deemed sufficient to say that all the questions hereafter discussed, and some which are decided against appellant without discussion, have been properly presented for decision, and have been given careful consideration. The most important questions are those hereafter discussed in this opinion.

[1] I. It is contended on behalf of appellant that, as the written contract stipulated for interest at the rate of 8 per cent. per annum only, the additional stipulation that appellant was to have 10 per cent. of the net profits of the business did not and could not render the contract usurious, although the parties may have believed and intended that as a result thereof appellant would obtain more than 10 per cent. per annum for the use of the money loaned, and although that result may have followed. On behalf of appellees the contention is made, and seems to have been sustained by the trial court, that if the contract was made with the intent and for the purpose of enabling appellant to obtain more than 10 per cent. per annum for the use of the money loaned, it was usurious. The contract referred to constituted an agreement between appellant and the Belton Oil Company, and was not a contract between appellant and either of the other parties to this suit; and, for reasons which will hereafter be stated, we hold that the Mid-Tex Oil Mills and N. K. Smith, the appellees in this suit, as they were not parties to the contract referred to, and have acquired no rights based upon that contract, therefore, if that contract was usurious, it affords them no grounds for relief. Hence it becomes unnecessary for this court to decide whether or not, as between the parties to that contract, it was usurious.

[2, 3] II. We will now consider and discuss the ruling of the trial court complained of by appellant, to the effect that appellees in this case, the Mid-Tex Oil Mills and N. K. Smith, who were plaintiffs in the court below, had the right to assert whatever rights the Belton Bartlett, and Granger Oil Mills had, arising out of the contracts between them and appellant Sugg, including the right to plead usury as to transactions between them, and to thereby avoid or diminish appellees' liability to appellant upon the promissory notes executed by them.

On July 13, 1911, the directors of the Bartlett Oil Mill passed this resolution:

"Whereas, the Bartlett Oil Mill, a corporation, is indebted to J. D. Sugg in the sum of $227,131, which is secured by outstanding bonds secured by a deed of trust on all of the real estate, buildings, fixtures, machinery, and other property of the same, and by a chattel mortgage on the product and personal property thereof; and whereas, said indebtedness, and every part thereof, is past due and unpaid, and said corporation is unable to pay same in money; and whereas, said consideration is reasonable and sufficient, and all the stockholders of said corporation having requested and agreed to said sale, and having ratified and confirmed the same; now, therefore, be it resolved that the officers of said corporation be and they are hereby requested, authorized, and directed to execute and deliver to J. D. Sugg a general warranty deed conveying to said Sugg, in consideration of said indebtedness, and the surrender of bonds, all of the real estate, buildings, improvements, fixtures, machinery franchises, and all other property of said Bartlett Oil Mill, and their acts in the premises in executing and delivering said deed are hereby in all things ratified and confirmed, said conveyance, however, to be conditional that said J. D. Sugg does not assume or agree to pay, or become in any way liable to pay any other indebtedness which said Bartlett Oil Mill may now owe or may hereafter become liable for."

On the same day the directors of the Belton Oil Company and of the Granger Oil Mill, respectively, passed resolutions of like tenor and recitals.

On July 13, 1911, the Bartlett Oil Mill executed and delivered to J. D. Sugg a deed to its plant containing, among other things, the following recitals:

"Know all men by these presents, that the Bartlett Oil Mill, a corporation created and existing under the laws of Texas, with its principal office and place of business at Bartlett, Williamson county, Tex., for a valuable consideration to it in hand paid by J. D. Sugg, as follows: The cancellation, surrender, and extinguishment of the following bonds now outstanding against the properties of the Bartlett Oil Mill, viz. first mortgage bonds numbers 1 to 25, inclusive, being for the sum of $1,000 each, issued by the Bartlett Oil Mill September 1, 1916, payable to bearer at the Hanover National Bank of New York City, N. Y., on the 1st day of September, A. D. 1916, with six per cent. interest per annum from date; said bonds being secured by a deed of trust executed by the Bartlett Oil Mill on the 26th day of June, 1906, recorded in the Deed of Trust Records of Williamson county, Texas, in volume 22, beginning at page 354, wherein said company conveyed to Charles B. Smith, trustee, all of the property hereinafter described and then owned and thereafterwards acquired by the

Bartlett Oil Mill. It being understood and agreed that said bonds are held and owned by the said J. D. Sugg to secure the payment of certain indebtedness aggregating $227,131 due said Sugg by Bartlett Oil Mill, which indebtedness is hereby extinguished by the acceptance of this deed."

On the same date the Belton Oil Company and the Granger Oil Mill, respectively, executed deeds conveying their plants to J. D. Sugg, containing recitals, in substance, the same as in the deed from the Bartlett Oil Company, with the exception of modifications so as to describe the bonds of the company conveying.

On the 15th day of July, 1911, each of said corporations filed in the office of the Secretary of State a resolution for the dissolution of the company under subdivision 3, art. 1205, of the Revised Statutes, and thereupon each of said corporations was dissolved and ceased to exist.

The proof shows that, after making the contract referred to between appellant and Belton Oil Company, the Bartlett and Granger Companies were organized, and it seems that by agreement of all the parties Sugg extended financial aid to both the other companies upon the same terms and under the same contract as with the Belton Oil Company. Various sums of money were advanced to the several companies, and various payments were made by them to appellant. Settlements were made about July 1, 1909, and July 1, 1910, at which times new notes were given; and about July 13, 1911, a settlement was had, upon which it was ascertained that the three companies owed Sugg $227,131, which amount included 8 per cent. per annum, stipulated as interest, and one-tenth of the net profits of the mills. Thereupon, as shown by the foregoing recital, each of the companies conveyed to Sugg its plant and property, reciting in the deed that it was accepted by him in consideration of the cancellation, release, and satisfaction of the indebtedness of each company to him. It was understood at the time these conveyances were made that a new company should be chartered, to be known as the Mid-Tex Oil Mills, and that when chartered Sugg should convey the property to the new company, retaining a vendor's lien to secure said indebtedness. Pursuant to this agreement, the Mid-Tex Oil Mills was chartered, and on July 17, 1911, Sugg conveyed the property to it, retaining a lien in the deed to secure two vendor's lien notes executed by the Mid-Tex Oil Mills, and indorsed by N. K. Smith, bearing interest at the rate of 8 per cent. per annum, one being for $100,000 and the other for $127,131. As additional security N. K. Smith executed a mortgage to secure the payment of the two notes on certain property belonging to him individually.

The proof shows that N. K. Smith owned stock in all the old corporations, that Sugg also owned stock in them, but some of the other stockholders did not own stock in all the corporations. It is further shown that the stock in the new corporation, the Mid-Tex Oil Mills, was apportioned pro rata among the stockholders in the old corporations, and that no person not a stockholder in one of the old corporations received any stock in the new corporation.

The foregoing facts are shown by the undisputed proof, and therefore it is contended on behalf of appellant that neither the Mid-Tex Oil Mills nor N. K. Smith can be heard to complain of usury in any transaction which occurred between appellant Sugg and either or all of the old corporations. In other words, the contention is that the Mid-Tex Oil Mills, which is a private corporation, is a separate and distinct person or legal entity; and that when it purchased the property which formerly belonged to the other three corporations, and executed its promissory notes in payment thereof, and when appellee Smith indorsed the notes as surety, they acquired no right to, and cannot now be heard to assert any claim of, the three other corporations as to usurious transactions between them and appellant; and we hold, upon both reason and authority, that the proposition asserted by appellant is sound and must be sustained. North Tex. Saving & Bldg. Ass'n v. Hay, 23 Tex. Civ. App. 98, 56 S. W. 580; Southern Home Bldg. & Loan Ass'n v. Winans, 24 Tex. Civ. App. 544, 60 S. W. 825; People's Bldg., Loan & Svgs. Ass'n v. Sellars, 19 Tex. Civ. App. 201, 46 S. W. 370; Bldg. & Loan Ass'n v. Price, 18 Tex. Civ. App. 370, 46 S. W. 92; 39 Cyc. 1068 to 1070.

The authorities cited, as well as many others, hold that when one person enters into an obligation to discharge a debt owing by another person, such person so obligating himself cannot successfully assert as a defense that the debt which he has promised to pay was usurious. Counsel for appellees have undertaken to uphold the ruling of the trial court in their favor upon that point by citing Ry. Co. v. Shirley, 54 Tex. 137; R. R. Co. v. Fryer, 56 Tex. 609; Southern Steel Co. v. Hopkins, 157 Ala. 175, 47 South. 274, 20 L. R. A. 848, 131 Am. St. Rep. 20, 16 Ann. Cas. 690; Island City Savings Bnk. v. Sachtleben, 67 Tex. 420, 3 S. W. 733; People v. Railroad, 120 Ill. 48, 10 N. E. 663; Charity Hospital v. N. O. Gas Light Co., 40 La. Ann. 382, 4 South. 433; Thompson on Corporations, §§ 6040, 6062, and 6083.

In addition to the cases cited, appellees have alleged in their pleading and claim that the proof shows that the Mid-Tex Oil Mills was, by agreement of all the parties at interest, an amalgamation or consolidation or merger of the three old corporations, and therefore it was a successor to all the rights which the former had, including the right to plead usury concerning the indebtedness of the old corporations to appellant Sugg.

The authorities cited by counsel for ap-

pellees, in so far as we have been able to ascertain, do not sustain their contention. In some, if not all, of them, the consolidation of separate corporations was brought about by agreement of the parties acting under a statute expressly authorizing such consolidation; and in some of them the statute prescribed that the new corporation, upon taking over the property of the other corporations, should be liable for its debts. Liability in such cases exists by force of statutory law so declaring, and is not based upon any holding that the corporation held liable is identical with, or the successor of, the selling corporation. In the case at bar there was no enabling act or statutory law declaring that the Mid-Tex Oil Mills, or any other person who might acquire the assets of the Belton, Bartlett, and Granger Oil Mills, should be substituted to any of the rights or liabilities of such dissolved corporations. Appellees charge in their pleading that the transactions referred to were the result of a scheme or device on the part of appellant, for the purpose of concealing and avoiding usury concerning the debts of the three dissolved corporations, but the jury found in his favor upon that issue, and the proof indicates that the changes referred to were first suggested by appellee N. K. Smith, who was agent and acting for the dissolved corporations.

However that may be, it is quite clear that the new corporation is a separate and distinct legal entity, and that it is neither all nor one of the old corporations. Unlike natural persons, when corporations die or cease to exist they have no heirs who inherit their property or their rights. Their assets belong to the stockholders, subject to the rights of the creditors of the corporation; but while that is the case, the stockholders do not constitute the corporation or its legal representative further than is necessary for the protection of their rights as stockholders. As a general rule, penalties and remedies prescribed by usury statutes inure to the benefit of no one except the borrower or his legal representatives. However, this is not always the same, and it has frequently been held that a subsequent mortgagee, who has not assumed the payment of the pre-existing mortgage, has the right to show usury in the pre-existing debt, if the property is not of sufficient value to discharge both debts. This is true because of the equitable doctrine which authorizes courts of equity to disregard forms and rules of law when it is necessary to do so in order to administer justice. But when there is a complete novation, and the pre-existing debt is discharged, and the property by which it was secured is transferred to another person in consideration of such other person's obligation to pay a specified sum of money, or when the transaction does not amount to a novation, and as part or all of the consideration for the transfer of the property the purchaser agrees to pay off a pre-existing debt, the amount of which is agreed upon, then the right to plead usury as to prior transactions does not inure to the benefit of the purchaser. Also it' seems equally clear to us that the transactions under consideration did not constitute an amalgamation, merger, or consolidation of the old corporations to the extent and in the sense that the new corporation acquired all the rights which the old corporations possessed, including the right to plead usury as to former transactions.

So, we conclude that, upon the clear and undisputed testimony, the transactions referred to show either a complete novation, resulting from the fact that the old corporations conveyed all their assets to appellant Sugg, in consideration of the release of all their indebtedness to him, and he then sold and conveyed the same to the Mid-Tex Oil Mills for a specified consideration, or that the Mid-Tex Oil Mills as principal and N. K. Smith as surety, as a result of the transactions referred to, agreed and obligated themselves to pay the indebtedness of the old corporations to Sugg, amounting, by agreement of all the parties, to $231,000. We see no escape for appellees from one or the other of these propositions, and in either event it is well-established law that they are not entitled to plead usury as to any of the transactions between appellant and the dissolved corporations.

In concluding this subject, we copy, and in the main approve, as follows from appellant's printed argument:

"In the first place it must be remembered that the statute against usury gives the remedy to the borrower or his legal representative. This right is a personal right, and cannot, so far as any question here is involved, pass to any one except to some one recognized by law as the legal representative of the borrower. * * * The question then naturally and necessarily arises, is the Mid-Tex Oil Company the same identical legal person as the three defunct corporations, or, if not, is it recognized in law as the 'legal representative' of said dissolved corporations? In the first place, bluntly speaking, the dissolution of a corporation, like the dissolution of an individual, is death, and there is no such thing as inheriting from a corporation. So a corporation which is not in existence cannot have legal representatives. A corporation which has surrendered its charter under forms of law is extinct. A new corporation can have no legal existence before its birth. A corporation may change its name, or its stockholders, or its officers, or its residence, and continue in existence, but when it surrenders its charter it is gone. Its physical properties are left, but all purely personal rights which must be asserted by it alone die with it. There is no general statute in this state for consolidation or succession of corporations, nor was there any special enabling act in this instance. When a new corporation by contract assumes the debt of another, then, with respect to its right to plead usury, it is brought clearly within the rule of the Texas cases denying it this right. The only theory upon which the Mid-Tex Oil Company can hope to plead alleged usury in the transactions between Sugg and the three extinct corporations is that said appellee can establish itself as being, in law and in fact, the same person as the three dissolved corporations. The statement in itself refutes the idea

that such could be true, but we will see what the decisions say:

"In Eddy & Cross, Receivers, v. Hinnant, 82 Tex. 354 [18 S. W. 562], the E. L. & R. Ry. Co. bought its right of way and promised the appellee a free pass on its road. The railway sold out to the M., K. & T., which went into the hands of appellants as receivers, and they refused to honor the pass. Being sued for damages for putting appellee off the train, Judge Gaines, for the court, held that, unless the purchaser 'promised to perform the particular contract upon which the action is based, it could not be held liable, and that appellee's remedy, in the absence of such an understanding, would be for damages against the original company.' This case is cited to show that one company buying out another, lock, stock, and barrel, does not become its successor in law, and is not in law the same company. Bear in mind in this connection that if one company becomes bound for the debts of another, by reason of having assumed it, the company so assuming cannot plead usury. * * *

"Williams v. T. M. Ry. Co. [22 Tex. Civ. App. 278], 55 S. W. 130, is still a stronger case along the same line. This case calls attention to the fact that there is a special statute giving to one railroad, which purchases another, 'all the powers and privileges conferred by the law on chartered railroad, and provided that, notwithstanding the new incorporation, the portion of the road so purchased shall be subject to the same liabilities in the hands of the new corporation as in the hands of the purchasers of the original corporation.' The court, under that statute, held that the liabilities there referred to were the legal liabilities as distinguished from contractual liabilities. The very statute itself, in this instance, as well as all of the decisions, show that the spirit of our laws is based upon the assumption that there is, in law, no relation between a dissolving and organizing corporation, except such as is specifically fixed by statutory law or else by contract. In fact, at common law there is no such thing as succession of one corporation by another. Power to merge can exist only by plain legislative enactment. Riker, etc., v. United Drug Co., 79 N. J. Eq. 580, 82 Atl. 930, Ann. Cas. 1913A, p. 1190, and see full note citing and discussing many Texas cases at pages 1192, 1193. See cases cited in section 578, top of column 1, p. 1394, vol. 5, Decennial Digest. * * *

"Houston Ice & Brewing Co. v. Nicolini, 96 S. W. 84. This case simply holds that the fact that one corporation purchases the substantial assets of another and continues in the same line of business, that the new is not the old corporation, and is not liable for any of its debts except as it assumed to pay.

"Venner v. F. L. & T. Co., 90 Fed. 352, 33 C. C. A. 95, the opinion being written by Judge Lurton of the Circuit Court of Appeals and concurred in by Judge Taft and Severens. Without discussing this case at length, we quote the following from the opinion: 'The claim that the new and old corporations are identical legal entities, the former being nothing more than the latter under a change of name, cannot be sustained. * * * What occurred was in one sense a reorganization. But the new corporation is legally a new and distinct corporation. New articles of incorporation were subscribed and a new corporate organization perfected. That the new company was formed for the purpose and in the expectation of acquiring, through purchase, the property and franchise of the old waterworks company, and that it did finally become the owner of that property, and the franchise of the old company, does not affect the distinctness of the new corporation. That bondholders of the old company exchanged their securities for bonds of the new company does not affect the question. By such exchange they ceased to be creditors of the old and became creditors of the new. * * * If that company was unable to go forward and supply the city with water, we see no difficulty in a new company being organized to take over its contract and franchises in the way this company proposed to do.'

"Armour v. Bement's Sons, 123 Fed. 56 [62 C. C. A. 142]. In this case the only change in name was from Bement & Sons to Bement's Sons. The corporation was for the same purpose, with practically the same officers, and built upon the bought-up assets of the old and continued in the same business, and the contention was 'that the so-called corporation, Bement's Sons, is simply a continuation of the original corporation, Bement & Sons. * * *' The opinion, in substance, holds that while it is frequently true that a new corporation may be held responsible for the value of assets of an old taken over, this is not done upon the ground that the new corporation is identical with the old, in a strictly legal sense, and therefore the one upon which the obligations to pay rests, but upon the ground that it has unlawfully obtained assets which it is bound to surrender to the creditors. * * * It is of common occurrence that an insolvent corporation is compelled to go into liquidation. The individuals who compose it seek to save what they can from the wreck by organizing themselves into a corporation, and buying such of the properties of the former corporation as they can profitably use in the new. No principle of law is violated by their forming the new organization, and no right of the creditors of the old organization is injured, provided its assets are lawfully acquired by the new one. The decisions reannounce the old trust fund idea that the properties of the old corporation may, if fraudulently acquired by the new, be subjected to the debts of the old by proper proceedings in equity.

"In Ewing v. Composite Brake Shoe Co., 169 Mass. 72, 47 N. E. 241, we find the following syllabus: 'A corporation ceased to do business, and its stockholders, with one other person, formed a new corporation, with a different name, taking all the assets of the old corporation except the books. Held, that a creditor of the old corporation had an equitable right to follow its assets, but could not maintain an action of law against the new corporation.' And that it was not liable for the debt of the old corporation as originally contracted. * * * The opinion says: 'They have an equitable right to follow the assets of the old corporation; but they cannot maintain an action at law against the new corporation, for there is no privity of contract. To render the new corporation liable, there must be a new contract made, such as will amount to a novation. * * * If a new contract is made between a creditor of the old corporation and the new corporation, the latter is liable only on the new contract.' This opinion by the Supreme Court of Massachusetts is short, but directly to the point that the Mid-Tex Oil Company is not the same legal entity as the three dissolved corporations, and, the result naturally follows, could not plead usury in the debts of the old.

"In notes of 5 L. R. A. (N. S.) p. 520 et seq., it is held that, where a company gives its physical assets for stock in a new company, the new company does not become its successor and liable for its debts, but under the 'trust fund' idea creditors of old may follow the property and enforce equitable lien in certain cases. There is no privity of contract between the new corporation organized upon the corpus of the old and creditors of the old, and such creditors of the old cannot maintain an action in law against the new for their debts, unless by express assumption of the debt, and then their action is based on the contract, the payment of which is assumed by the new, and this conclusion would bring the Mid-Tex Oil Company, at best, in the position of having assumed the debts of the three old companies, and it is then brought clearly in

the rule of the Texas cases, cited in the original brief, that they cannot set up usury in the debt assumed. 11 L. R. A. (N. S.) p. 863. * * *

"We take it that it will be conceded that if the Mid-Tex Oil Company is placed in the attitude of a purchaser, or of one having assumed the debt of another, the fact that appellee, N. K. Smith, was surety on the old note, and became surety on the new, would be a matter of no importance in law; for if the Mid-Tex Oil Company was legally liable on the note it executed to appellant, and Smith, for any reason, became surety thereon, he could be in no better position to plead usury than the principal. * * *

"In Mann v. Bank of Elkton, 104 Ky. 852, 48 S. W. 413, is the following syllabus: 'Where the surety on a note, on which usurious interest had been paid, agreed with the principal, for a valuable consideration, to pay the debt, and the payee accepted his note for the balance due, without deducting usury, the principal, who was thereby discharged, may recover of the payee the usury theretofore paid.' The opinion goes on to hold that there was a complete novation of the debt, and that by accepting the new principal the transaction affords conclusive evidence that the parties intended that that should be a novation of the debt. And this conclusion is further apparent from the fact that appellant surrendered the notes which he held, and accepted other notes with a new principal in lieu thereof. This opinion is authority for the proposition that the acceptance of a new principal, with new date of maturity, even though the new principal is the surety on the old note, is a complete novation in law of the old debt, and severance of the old from the new, and that the new debtor cannot plead usury. * * *

"We have cited quite a number of cases only for the purpose of showing how strictly personal the law regards the right to plead usury. These cases are, however, probably unnecessary, by reason of the fact that our statute makes this just as personal a right as the English language can do.

"The sum total of this whole question is: Is the Mid-Tex Oil Company the same legal person as the three dissolved corporations? If it is, it may plead the defense of usury. If not, it cannot. Operating, as it does, under an entirely new charter, separate and distinct from that of either of the dissolved corporations, conclusively establishes the fact that it is not the old corporations. The new charter alone makes it a separate entity.

"The following is a list of authorities cited on the first proposition—that is, that the Mid-Tex Oil Company is not, in law, the three old companies: See full note to Riker, etc., Co. v. United Drug Co., Ann. Cas. 1913A, p. 1190, and note at pages 1192, 1193; Eddy & Cross, Receivers, v. Hinnant, 82 Tex. 354, 18 S. W. 562; Dallas Consol. Trac. Ry. Co. v. Maddox, 31 S. W. 702; Williams v. T. M. Ry. Co., 22 Tex. Civ. App. 278, 55 S. W. 130; cases cited in section 578, top of column 1, p. 1394, vol. 5, Decennial Digest; Clough v. Rocky Mountain Oil Co., 25 Colo. 520, 55 Pac. 809; Houston Ice & Brewing Co. v. Nicolini, 96 S. W. 84; Abilene Cotton Oil Co. v. Anderson, 41 Tex. Civ. App. 342, 91 S. W. 607; Venner v. F. L. & T. Co., 90 Fed. 352, 33 C. C. A. 95; Armour v. Bement's Sons, 123 Fed. 56, 62 C. C. A. 142; Ewing v. Composite Brake Shoe Co., 169 Mass. 72, 47 N. E. 241; notes to 5 L. R. A. (N. S.) p. 520 et seq.; 11 L. R. A. (N. S.) p. 863; Dunning v. Bates, 186 Mass. 123, 71 N. E. 309; Altoona v. Richardson, 81 Kan. 717, 106 Pac. 1025, 26 L. R. A. (N. S.) 651.

"The following is a list of the authorities discussed as to who may plead usury and kindred questions: Mann v. Bank of Elkton, 104 Ry. 852, 48 S. W. 413; F. & M. Sav. Co. v. Bazore, 67 Ark. 252, 54 S. W. 341; 8 L. R. A. (N. S.) 814, note; 56 L. R. A. note, pp. 694 to 699; Davidson v. Mex. Nat. Ry. Co., 11 App. Div. 28,

42 N. Y. Supp. 1015; Union Nat. Bank of Chicago v. Int. Bank of Chicago, 123 Ill. 510, 14 N. E. 859."

The court ruled against appellant on this branch of the case, and we hold that such ruling was erroneous.

[4-9] III. It is earnestly and forcibly urged on behalf of appellant that the trial court committed error in holding that all the payments made to appellant as interest, and on account of which no penalty was allowed because suit therefor was barred by limitation, should be credited upon the principal. In other words, the contention is that since the amendment of the usury statute so as to authorize the recovery of double the amount of the interest paid, as embodied in article 4982 of the Revised Statutes, the remedy there given is exclusive, and therefore the creditor has no right to have payments made as usurious interest credited upon the principal.

The statute referred to was enacted in 1892 (Acts 22d Leg., 1st called Sess., c. 6), and reads as follows:

"If usurious interest, as defined by the preceding articles, shall hereafter be received or collected, the person or persons paying the same, or their legal representatives, may, by action of debt, instituted in any court of this state having jurisdiction thereof, within two years after such payment, recover from the person, firms, or corporation receiving the same, double the amount of the interest so received or collected."

At the time the statute quoted above was enacted, it was well settled by the decisions of our Supreme Court that payments made upon usurious interest would be applied by the law to the principal debt, although both parties had agreed that such payments should be applied to the satisfaction of usurious interest; and the question is, Did the Legislature, by enacting the statute authorizing recovery of a penalty, intend to change the rule of law referred to, and destroy the right of the creditor to have payments made upon usurious interest credited upon the principal debt?

In determining that question it should be borne in mind that, prior to the enactment of the statute quoted, the people had incorporated in our Constitution the following language:

"All contracts for a greater rate of interest than ten per centum per annum shall be deemed usurious, and the first Legislature after this amendment is adopted shall provide appropriate pains and penalties to prevent the same; but when no rate of interest is agreed upon, the rate shall not exceed six per centum per annum." (Const. art. 16, § 11.)

That amendment was adopted in August, 1891, and the first session of the Legislature which convened thereafter, in obedience to the mandate of the people as embodied in that amendment, enacted the statute above quoted. It is reasonable to suppose that the Legislature which framed and the people who adopted the constitutional amendment were of opinion that the law by which payments made upon usurious interest should be

applied to the principal was not adequate to prevent money lenders from exacting usurious interest, and therefore the Legislature was commanded to "provide appropriate pains and penalties to prevent the same." But the amendment referred to does not in terms, nor by necessary implication, signify that the pains and penalties which might subsequently be provided by legislation should be exclusive and result in depriving the creditor of his right, which existed before the amendment was adopted, to have payments of usurious interest credited upon the principal debt.

It has often been said by courts and text-writers that penal statutes, and those in derogation of the common law, should be strictly construed; but it is declared by section 3 of the Final Title of our Revised Statutes that such rule shall have no application in this state, and that statutory provisions shall be liberally construed with a view to effect their objects and to promote justice. It is also a rule of constitutional as well as statutory construction that, unless the context indicates otherwise, the language is to be given its ordinary signification.

Applying these rules to the constitutional provision referred to, and to the statute enacted in pursuance thereof and quoted above, it is believed that no sound reason can be shown for holding that it was intended by either to curtail any right which the law conferred upon the creditor prior to the enactment of the penalty statute, except, perhaps, to restrict him to only one remedy.

Counsel for appellant seem to present the contention that, by enacting the penalty statute, the Legislature intended, in all cases, to abrogate the rule of law by which such payments would be applied to the principal debt when it was shown that the contract was usurious, but we find nothing in the language of the statute which necessarily requires such construction.

In support of our ruling upon this branch of the case, we cite the following authorities as tending more or less to justify the conclusion reached: Hensel v. Int. Bldg. & Loan Ass'n, 85 Tex. 215, 20 S. W. 116; Abbott v. Loan Ass'n, 86 Tex. 467, 25 S. W. 620; Rosetti v. Lozano, 96 Tex. 57, 70 S. W. 204; Int. Bldg. & Loan Ass'n v. Biering, 86 Tex. 476, 25 S. W. 622, 26 S. W. 39; Amr. M. B. & S. Ass'n v. Daugherty, 27 Tex. Civ. App. 430, 66 S. W. 131; People's Bldg., Loan & Saving Ass'n v. Bessonette, 48 S. W. 52; Natl. Loan & Investment Co. v. Stone, 46 S. W. 67.

The Bessonette Case was decided by this court and seems to be directly in point, to the effect that the statute authorizing recovery of penalty is not exclusive, and does not deprive the creditor of his right to have payments of usurious interest credited upon the principal debt. It is true, as contended by counsel for appellant, that a cause of action for recovery of the penalty comes into existence as soon as the payment of usurious interest is made. But the right of action given by the statute is not a recovery of the money paid by the creditor, but it is an action to recover a penalty, and the fact that the amount of the penalty is measured by the amount of interest paid does not change the fact that the recovery is a penalty. It is true that the statute does not in terms designate the recovery as a penalty; but when we consider that it was enacted in pursuance of a constitutional mandate, commanding the Legislature to provide appropriate pains and penalties to prevent usury, and the fact that the amount of the recovery is double the amount necessary to compensate the creditor, we are forced to the conclusion that the Legislature intended it as a penalty to prevent the collection of usury. But when this conclusion is reached, a predicate exists for invoking, with some plausibility, the rule to the effect that when the law prescribes one penalty for its violation, and thereafter the lawmaking department of the government prescribes another penalty, proper construction of the latter requires the holding that it supersedes and repeals the former penalty.

A sufficient answer to that argument is found in the fact that prior to the enactment of the statute referred to, authorizing the recovery of a penalty for the collection of usurious interest, no such penalty existed. The usury statute merely prescribes that a debtor could not be compelled to pay usurious interest, and in construing that statute our Supreme Court held that, as there could be no interest due upon a usurious contract if a payment was made upon what the parties designated as interest, the law would apply such payment to the principal debt. The ruling referred to was not intended as fixing a penalty, and, if any penalty existed, it resulted from that provision of the statute forbidding the collection of usurious interest. Perhaps the ruling referred to should be sustained upon the ground that, as usurious contracts are prohibited by the state Constitution, it would violate a rule of public policy for the courts to uphold a contract or a transaction which would result in nullifying the constitutional and statutory prohibition of usurious interest; and upon such consideration, and for such reason, it could well have been said that, though parties may have agreed to apply a payment to usurious interest, the law would not enforce such agreement, and, in order to prevent that result, it was necessary that such payment be applied to the principal debt.

The statute now under consideration goes further than the courts had gone, and fixes a penalty for the offense of receiving a payment upon a contract for interest which is in violation of the usury statute. So it is, in view of these considerations, and looking to the evil sought to be remedied, and the language used by the Legislature to accomplish that end, we do not believe that it was

the intention of the Legislature in adopting the statute under consideration to abrogate or destroy the rule of law as then established by the Supreme Court concerning the application of payments made upon usurious interest.

While the writer of this opinion is strongly inclined to that view of the law, in the case at bar it is not contended, and this court does not hold, that the creditor has the right to recover the penalty prescribed for the collection of usurious interest, and in addition thereto have the amount paid as such interest credited upon the principal. But we do hold that he has his right of election, and, if he does not sue for the penalty, he will be entitled to have the amount paid as usurious interest credited upon the principal. This construction of the statute is supported by both common sense and justice. Its adoption and enforcement will tend strongly to prevent those who lend money from making usurious contracts and collecting usurious interest. On the other hand, if the contention urged on behalf of appellant be adopted, the unfortunate borrower, who on account of his necessitous circumstances, or for any other reason, fails to sue for the penalty prescribed for the collection of usurious interest within two years after such collection, would be left without remedy, and the result would be that the grasping money lender would be permitted to collect usurious interest as well as the principal debt, which would be the accomplishment of that which our usury law has sought to prevent.

We have deemed it proper to express our views at some length upon this subject, because of its great importance, though our ruling to the effect that the appellees cannot go behind the contract and notes executed July 11, 1911, greatly diminishes the importance of that question in this case.

[10, 11] IV. Concerning appellant's contention to the effect that all questions of usury had been eliminated by compromise contract of settlement made by the parties in 1914, we have reached this conclusion: Appellees pleaded failure of consideration as to that contract, and the trial court seems to have regarded that plea as sustained by the uncontradicted testimony. That ruling was correct, unless it be that, in releasing a portion of the 10 per cent. attorney's fees stipulated in his notes, appellant thereby parted with a substantial right. The proof shows that appellant had placed the notes in the hands of attorneys for collection before suit was brought. A settlement was agreed upon, the time of payment extended, and new notes executed. In making that settlement by the agreement of all the parties, including attorneys who were representing appellant, the amount of attorney's fees was fixed at considerable less than 10 per cent. of the debt and interest. We overrule appellant's contention that, as he had placed his claims in the hands of attorneys for collection, he was necessarily entitled to recover the stipulated 10 per cent. and therefore, when he relinquished a part thereof, such relinquishment constituted a sufficient consideration for the contract. It is settled law in this state that such obligations are contracts for indemnity only, and that the obligee is entitled to collect only a fair and reasonable amount as attorney's fees although such amount may be less than the per cent. stipulated in the contract. We hold that upon another trial the question of reasonableness of the amount of the attorney's fees agreed upon should be submitted to the jury, and if the jury finds that the amount agreed upon was less than a fair and reasonable compensation for the services which had been rendered by the attorneys, then the court should hold that the contract was based upon a sufficient consideration and was valid. But if the jury should find that the amount agreed upon was fair and reasonable, then, as that was the only amount appellant was entitled to, the contract was without consideration, and should be so treated.

[12] V. We are unable to sanction appellant's contention to the effect that payments made to him by N. K. Smith on the notes executed by the Mid-Tex Oil Mills cannot be considered in determining the question of usury arising out of transactions concerning that indebtedness. Smith was indorser upon the notes referred to; therefore he was a party to them, and is a party to this suit; and if he made any payments on the notes, whether such payments consisted of money or other property, and it was intended thereby and in fact resulted in appellant Sugg obtaining more than 10 per cent. per annum as compensation for the use of his money, then such transactions were usurious, and, if not barred by limitation, appellees can recover the statutory penalty; but if such right of recovery is barred, then appellees are entitled to have the value of such payments credited upon the principal debt.

[13] VI. We do not see that the court committed any error in reference to the question of usury involved in the $10,000 note, and, if that was the only question of usury remaining after the Mid-Tex Oil Mills executed the obligations sued upon by appellant, we might render judgment finally disposing of the case in this court. But as the findings of the jury are not such concerning some other transactions between appellant and appellees as will enable this court to render final judgment concerning those issues, the entire case will be sent back for another trial. In other words, if the contract between appellant and appellee Smith, made in 1912, and by which Smith agreed to transfer to appellant stock in the Mid-Tex Oil Mills of the face value of $100,000, was intended as compensation for the use or de-

tention of the money which appellees then owed Sugg, and was not in good faith intended only as a consideration for the extension of time of payment of the debt or as compensation for services rendered by Sugg, and if, as a result of that contract, any of the stock referred to was transferred to and received by appellant, and if it was of such value as rendered appellant's compensation for the use of the money more than 10 per cent. per annum, then such transaction was usurious, and should be dealt with by the trial court in the manner prescribed in the third subdivision of this opinion. But if it was in good faith intended by Smith and received by appellant Sugg as a consideration for the agreement to extend the time, or as compensation for services rendered by him, and not as compensation for the use of the money, then such transaction was not usurious. And what is said in reference to that transaction will apply to any others of a similar nature which may be disclosed by the testimony.

[14] VII. We overrule appellant's contention to the effect that there was a misjoinder of parties plaintiff and causes of action, because of the fact that both the Mid-Tex Oil Mills and the plaintiff Smith were seeking to recover separate penalties. The matters referred to and the transactions involved were so connected as, in our opinion, authorize their litigation in the same suit. And especially was that the case after appellant filed his cross-action and sought to recover against both the plaintiffs, in reply to which cross-action either of the defendants had the right to set up a counterclaim against appellant.

VIII. Some other questions are presented in appellant's brief which will not be adverted to in this opinion further than to say that they are decided against appellant; and we believe that what has already been said, and the rulings which have already been made, will enable the trial court to retry the case in accordance with our views of the law.

On account of the errors heretofore indicated, the judgment of the trial court is reversed and the case remanded.

Reversed and remanded.